**No. 14-30217**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee,*

**v.**

**MOHAMED OSMAN MOHAMUD,**

*Defendant-Appellant,*

_____

On Appeal From the United States District Court
For the District of Oregon
Honorable Garr M. King

_____

**BRIEF OF AMICUS CURIAE NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS IN SUPPORT OF
APPELLANT AND URGING REVERSAL**

_____

Joshua L. Dratel
LAW OFFICES OF JOSHUA L.
DRATEL, P.C.
29 Broadway, Suite 1412
New York, NY 10006
Telephone: (212) 732-0707
NACDL National Security Committee
NACDL Amicus Curiae Committee

John D. Cline
LAW OFFICE OF JOHN D. CLINE
235 Montgomery Street, Suite 1070
San Francisco, CA 94104
Telephone: (415) 322-8319
cline@johndclinelaw.com

Attorneys for Amicus Curiae
National Association of Criminal
Defense Lawyers

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae National Association of Criminal Defense Lawyers ("NACDL") submits the following corporate disclosure statement, as required by Fed. R. App. P. 26.1 and 29(c):  NACDL is a nonprofit corporation organized under the laws of the District of Columbia.  It has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

DATED:  June 3, 2015

Respectfully submitted,

_____*/s/ John D. Cline*_____
John D. Cline

Attorney for Amicus Curiae
National Association of Criminal
Defense Lawyers

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ii

INTEREST OF AMICUS CURIAE ......................................................... 1

SUMMARY OF THE ARGUMENT ........................................................ 2

ARGUMENT .......................................................................................... 3

I.    DISCLOSURE IS "NECESSARY" UNDER 50 U.S.C. § 1806(f) WHEN IT WOULD SUBSTANTIALLY PROMOTE AN ACCURATE DETERMINATION OF LEGALITY.................................... 3

    A.    Courts Routinely Interpret "Necessary" To Mean Something Less Than Essential or Indispensable.................................... 3

    B.    The Legislative History of FISA Shows That Congress Intended Disclosure When It Would Substantially Promote Accurate Determination of Legality...................................... 5

    C.    The Legislative Purpose of FISA--To Balance Civil Liberties and National Security--Supports the "Substantially Promotes" Standard........................................................................... 10

II.    DISCLOSURE OF THE FISA MATERIALS IS REQUIRED AS A MATTER OF DUE PROCESS ................................................. 14

    A.    The "Private Interest" ....................................................... 15

    B.    The Risk of Erroneous Deprivation and the Value of Additional Procedures ........................................................................ 16

    C.    The Government Interest................................................... 21

    D.    Disclosure Is Also Required Under *Brady* ....................... 24

CONCLUSION.................................................................................... 24

i

# TABLE OF AUTHORITIES

## Cases

*American-Arab Anti-Discrimination Committee v. Reno*,
 70 F.3d 1045 (9th Cir. 1995) ..................................................... 15, 16, 17, 20, 21

*Alderman v. United States*,
 394 U.S. 165 (1969) ................................................................................. 17

*Armour & Co. v. Wantock*,
 323 U.S. 126 (1944) ................................................................................... 4

*Brady v. Maryland*,
 373 U.S. 83 (1963) ......................................................................... 3, 23, 24

*Cellco Partnership v. FCC*,
 357 F.3d 88 (D.C. Cir. 2004) ................................................................... 3

*Circuit CityStores, Inc. v. Adams*,
 532 U.S. 105 (2001) ................................................................................. 10

*Cheek v. United States*,
 498 U.S. 192 (1991) ................................................................................. 14

*Commissioner v. Tellier*,
 383 U.S. 687 (1963) ................................................................................... 4

*CT&IA v. FCC*,
 330 F.3d 502 (D.C. Cir. 2003) ................................................................. 4

*Franks v. Delaware*,
 438 U.S. 154 (1978) ....................................................................... 11, 12, 18

*FTC v. Rockefeller*,
 591 F.2d 182 (2d Cir. 1979) ..................................................................... 4

*Hall v. United States*,
 132 S. Ct. 1882 (2012) ............................................................................... 9

*In re All Matters*,
 218 F. Supp. 2d 611 (Foreign Intelligence Surveillance Court ), *rev'd*, 310 F.3d
 717 (Foreign Intelligence Surveillance Court of Review 2002) .................. 18, 19

*In re FBI*,
2009 U.S. Dist. LEXIS 132935 (FISC Sept. 25, 2009) ...................................... 19

*In re Kevork*,
788 F.2d 566 (9th Cir. 1986) ............................................................................ 10

*Jencks v. United States*,
353 U.S. 657 (1957) ........................................................................................ 24

*Johnson v. United States*,
333 U.S. 10 (1948) .......................................................................................... 19

*Kiareldeen v. Reno*,
71 F. Supp. 2d 402 (D.N.J. 1999) ......................................................... 15, 17, 21

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ....................................................................... 3, 14, 15, 20

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004) ............................................................................... 4

*Rafeedie v. INS*,
795 F.2d 13 (D.D.C. 1992) ........................................................................ 15, 21

*Rafeedie v. INS*,
880 F.2d 506 (D.C. Cir. 1989) ......................................................................... 15

*[Redacted]*,
2011 U.S. Dist. LEXIS 157706 (FISC Oct. 3, 2011) ......................................... 19

*Snider v. United States*,
468 F.2d 500 (8th Cir. 2006) .............................................................................. 4

*United States v. Andolschek*,
142 F.2d 503 (2d Cir. 1944) ............................................................................ 25

*United States v. Daoud*,
755 F.3d 479 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1456 (2015) ................. 12

*United States v. Gamez-Orduno*,
235 F.3d 453 (9th Cir. 2000) ........................................................................... 24

*United States v. Gowadia*,
2010 U.S. Dist. LEXIS 80572 (D. Haw. May 8, 2010) ...................................... 22

*United States v. Hammoud,*
381 F.3d 316 (4th Cir. 2004) (en banc), *vacated*, 543 U.S. 1097 (2005),
*reinstated in part*, 405 F.3d 1034 (4th Cir. 2005) (en banc) ............................... 10

*United States v. James Daniel Good Real Property,*
510 U.S. 43 (1993) ......................................................... 16

*United States v. Lee,*
2000 U.S. App. LEXIS 3082 (10th Cir. Feb. 29, 2000) ...................................... 23

*United States v. Reynolds,*
345 U.S. 1 (1953) ......................................................... 24

*Yates v. United States,*
135 S. Ct. 1074 (2015) ...................................................... 10

*Zadvydas v. Davis,*
533 U.S. 678 (2001) ....................................................... 14

## Constitution, Statutes, and Rules

U.S. Const. Amend. V ............................................................. 3, 14,

18 U.S.C. App. 3 § 3 ............................................................. 21

18 U.S.C. App. 3 § 4 ............................................................. 23

18 U.S.C. App. 3 § 6 .............................................................. 8

18 U.S.C. App. 3 § 9 ............................................................. 22

50 U.S.C. § 1801(e) ............................................................. 9, 10

50 U.S.C. § 1801(h) ............................................................. 9, 10

50 U.S.C. § 1806(f) .......................................................... *passim*

50 U.S.C. § 1806(g) ............................................................ 2, 14

Fed. R. App. P. 29 ............................................................... 2

## Other Authorities

H. Conf. Rep. 1720, 95th Cong., 2d Sess. (Oct. 5, 1978) ........................................ 9

S. Rep. 604(I), 95th Cong., 1st Sess.,
    *reprinted in* 1978 U.S.C.C.A.N. 3904 ........................................ 5, 7, 8, 9, 10, 11

S. Rep. 701, 95th Cong., 1st Sess.,
    *reprinted in* 1978 U.S.C.C.A.N. 3973 ........................................ 5, 7, 8, 9, 10, 11

9 United States Attorney's Manual, Criminal Resource Manual § 2054(I)(C) ....... 22

## INTEREST OF AMICUS CURIAE

Amicus Curiae National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct.[1]

NACDL was founded in 1958. It has a nationwide membership of more than 10,000 and an affiliate membership of more than 35,000. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. The American Bar Association recognizes NACDL as an affiliated organization and awards it full representation in its House of Delegates.

NACDL files numerous amicus briefs each year in the Supreme Court and the courts of appeals, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole.

---

[1] Counsel for amicus state that no counsel for a party authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than amicus, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

In accordance with Fed. R. App. P. 29(a), amicus states that all parties have consented to the filing of this brief.

## SUMMARY OF THE ARGUMENT

When an "aggrieved person" such as Mohamud moves to suppress the fruits of Foreign Intelligence Surveillance Act[2] surveillance, the court must review the FISA application, order, and related materials *ex parte* and *in camera*, unless "disclosure [to the defendant] is necessary to make an accurate determination of the legality of the surveillance," 50 U.S.C. § 1806(f), or unless disclosure is required as a matter of due process, *id.* § 1806(g). Although the district court acknowledged that "it would be helpful to the court to have defense counsel review the [FISA] materials prior to making arguments," the court interpreted "necessary" in § 1806(f) to mean "much closer to 'essential' than to 'helpful'" and denied disclosure to the defense. ER I:226. As a result, the novel and complex FISA issues that this case presents were resolved based on the court's *ex parte* review of the underlying materials.

As we demonstrate below, the court erred in its interpretation of § 1806(f). Part I shows that disclosure is "necessary" under § 1806(f) when it would substantially promote an accurate determination of legality--a standard far less

---

[2] For these purposes, references to FISA surveillance include FISA Amendments Act ("FAA") surveillance. Disclosure of the relevant materials underlying either form of surveillance turns on 50 U.S.C. § 1806(f) and (g).

demanding than "essential."  Part II shows that disclosure is required as a matter of Due Process under the well-established *Mathews v. Eldridge*, 424 U.S. 319 (1976), standard and under *Brady*.[3]

## ARGUMENT

### I.  DISCLOSURE IS "NECESSARY" UNDER 50 U.S.C. § 1806(f) WHEN IT WOULD SUBSTANTIALLY PROMOTE AN ACCURATE DETERMINATION OF LEGALITY.

The legislative history and statutory purposes of 50 U.S.C. § 1806(f) demonstrate that disclosure is "necessary" under § 1806(f) when it would substantially promote an accurate determination of legality.

As the D.C. Circuit has observed, "The term 'necessary' is a chameleon-like word whose meaning . . . may be influenced by its context . . . .  [It] is not language of plain meaning."  *Cellco Partnership v. FCC*, 357 F.3d 88, 96-97 (D.C. Cir. 2004)).  The "context" of  § 1806(f), including its legislative history and the purposes of FISA, demonstrates that Congress intended courts to order disclosure when defense access to the underlying FISA materials would substantially promote the accuracy of the court's determination of legality.

### A.  Courts Routinely Interpret "Necessary" To Mean Something Less Than Essential or Indispensable.

Courts have frequently interpreted "necessary" to mean "less than absolutely essential, and have explicitly found that a measure may be 'necessary' even though

---

[3] Appellant raises this issue in Part IX.D. of his opening brief.

acceptable alternatives have not been exhausted." *CT&IA v. FCC*, 330 F.3d 502, 510 (D.C. Cir. 2003) (quotation omitted). In *Commissioner v. Tellier*, 383 U.S. 687 (1966), for example, the Supreme Court found that the word "necessary" in the phrase "ordinary and necessary [business] expenses" imposes "only the minimal requirement that the expense be appropriate and helpful for the development of the taxpayer's business." *Id*. at 689 (quotations and brackets omitted).

Cases interpreting "necessary" emphasize that its meaning must be "harmonized with its context." *Armour & Co. v. Wantock*, 323 U.S. 126, 130 (1944). Relying on context, courts have often found "necessary" to mean something closer to "helpful" than to "essential" or "indispensable." *See, e.g., Snider v. United States*, 468 F.3d 500, 513 (8th Cir. 2006) (interpreting "necessary" in 26 U.S.C. § 6103; court rejects "strictly essential" and holds that the "'appropriate or helpful' meaning of 'necessary' is the only practical interpretation in this context"); *Prometheus Radio Project v. FCC*, 373 F.3d 372, 393-94 (3d Cir. 2004) (interpreting "necessary" in § 202(h) of the Telecommunications Act of 1996 to mean "'convenient,' 'useful,' or 'helpful,' not 'essential' or 'indispensable'"); *FTC v. Rockefeller*, 591 F.2d 182, 188 (2d Cir. 1979) (interpreting "necessary" in 15 U.S.C. § 46; court holds that FTC's authority to conduct an ancillary investigation of a bank when "necessary" did not require investigation to be

4

"absolutely needed" or "inescapable," but instead that it "arise reasonably and logically out of the main investigation").

These cases confirm that the word "necessary" in § 1806(f) must be read in light of the legislative history of FISA and the statutory purpose. These interpretive aids demonstrate that, in this context, "necessary" means that disclosure would substantially promote the accuracy of the court's determination of legality.

### B. The Legislative History of FISA Shows That Congress Intended Disclosure When It Would Substantially Promote Accurate Determination of Legality.

Two authoritative Senate Reports--one from the Senate Judiciary Committee and the other from the Senate Intelligence Committee--discuss in detail the provision that became § 1806. The Reports observe:

> The extent to which the government should be required to surrender to the parties in a criminal trial the underlying documentation used to justify electronic surveillance raises delicate problems and competing interests. On the one hand, broad rights of access to the documentation and subsequent intelligence information can threaten the secrecy necessary to effective intelligence practices. However, the defendant's constitutional guarantee of a fair trial could seriously be undercut if he is denied the materials needed to present a proper defense. The Committee believes that a just, effective balance has been struck in this section.

S. Rep. 604(I), 95th Cong., 1st Sess. 53, *reprinted in* 1978 U.S.C.C.A.N. 3904, 3954; *see* S. Rep. 701, 95th Cong., 1st Sess. 59 (similar passage in Senate Intelligence Committee Report), *reprinted in* 1978 U.S.C.C.A.N. 3973, 4028.

Turning to § 1806(f), the Committees summed up the disclosure provision as follows:

> The committee views the procedures set forth in this subsection as striking a reasonable balance between an entirely in camera proceeding which might adversely affect the defendant's ability to defend himself, and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information.

> The decision whether it is necessary to order disclosure to a person is for the Court to make after reviewing the underlying documentation and determining its volume, scope and complexity. The committee has noted the reasoned discussion of these matters in the opinion of the Court in United States v. Butenko, [494 F.2d 593 (3d Cir. 1974) (en banc)]. There, the Court, faced with the difficult problem of determining what standard to follow in balancing national security interests with the right to a fair trial stated:

> "The distinguished district court judge reviewed in camera the records of the wiretaps at issue here before holding the surveillances to be legal . . . Since the question confronting the district court as to the second set of interceptions was the legality of the taps, not the existence of tainted evidence, it was within his discretion to grant or deny Ivanov's request for disclosure and a hearing. The exercise of this discretion is to be guided by an evaluation of the complexity of the factors to be considered by the court and by the likelihood that adversary presentation would substantially promote a more accurate decision." (494 F.2d at 607.)

> Thus, in some cases, the Court will likely be able to determine the legality of the surveillance without any disclosure to the defendant. In other cases, however, the question may be more complex because of, for example, indications of possible misrepresentation of fact, vague identification of the persons to be surveilled or surveillance records which includes [sic] a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order. In such cases, the committee contemplates that the court will likely decide to order disclosure to the defendant, in whole or in part since

such disclosure "is necessary to make an accurate determination of the legality of the surveillance." [Footnote omitted.]

Cases may arise, of course, where the Court believes that disclosure is necessary to make an accurate determination of legality, but the Government argues that to do so, even given the Court's broad discretionary power to excise certain sensitive portions, would damage national security. In such situations the Government must choose--either disclose the material or forego the use of the surveillance-based evidence. Indeed, if the Government objects to the disclosure, thus preventing a proper adjudication of legality, the prosecution would probably have to be dismissed . . . .

S. Rep. 604(I), *supra*, at 58-59 (footnote omitted; ellipsis in original), *reprinted in* 1978 U.S.C.C.A.N. at 3959-60; *see* S. Rep. 701, *supra*, at 64-65 (identical language in Senate Intelligence Committee Report), *reprinted in* 1978 U.S.C.C.A.N. at 4033-44.

Several points are evident from this passage. First, the Senate Judiciary and Intelligence Committees plainly did not intend to erect an insuperable barrier to disclosure. To the contrary, in choosing a balanced approach, the Committees specifically eschewed "an entirely in camera proceeding."

Second, the Committees--through their reliance on *Butenko*--suggest that the "necessary" standard is met when the district court determines that "adversary presentation would substantially promote a more accurate decision."

Third, the Committees noted the district court's "broad discretionary power to excise certain sensitive portions" from the FISA materials before disclosure. This recognition of the district court's inherent power to take necessary protective

7

measures finds a statutory basis both in § 1806(f) itself and in CIPA (discussed below).  That power substantially ameliorates any national security concerns.

Finally, the Senate Judiciary and Intelligence Committees contemplated-- and did not shy away from--the possibility that the court would order disclosure, the government would refuse to comply, and the court would suppress the surveillance or dismiss the prosecution.  Just as Congress did in CIPA, 18 U.S.C. App. 3 § 6(e), the Committees left the choice with the government:  either comply with the disclosure order or refuse and suffer appropriate sanctions.

Two other portions of the legislative history are relevant as well.  First, an early version of the definition of "foreign intelligence information" included the words "necessary" and "essential."  "Necessary," according to the Senate Judiciary Committee, "requires more than a showing that the information would be useful or convenient."  S. Rep. 604(I), *supra*, at 31, *reprinted in* 1978 U.S.C.C.A.N. at 3933. "Essential" requires "a showing that the information is important and required but not that it is of utmost importance or indispensable."  *Id*.  Thus, "necessary" merely meant something more than "useful or convenient," and not even "essential" required a showing that information was "indispensable."

The Senate Intelligence Committee deleted "essential" from the final definition of "foreign intelligence information" (codified at 50 U.S.C. § 1801(e)). The Intelligence Committee declared that by the term "necessary," it "intends to

require more than a showing that the information would be useful or convenient. The committee intends to require that the information is both important and required. The use of this standard is intended to mandate that a *significant need* be demonstrated by those seeking the surveillance." S. Rep. 701, *supra*, at 31 (emphasis added), *reprinted in* 1978 U.S.C.C.A.N. at 4000.

Second, the minimization procedures in 50 U.S.C. § 1801(h)(2) bar dissemination of nonpublicly available information in a manner that identifies any United States person without the person's consent, "unless such person's identity is necessary to understand foreign intelligence information or assess its importance." The House Conference Report explains that "[b]y 'necessary' the conferees do not mean that the identity must be essential to understand the information or assess its importance. The word necessary requires that a knowledgeable intelligence analyst make a determination that the identity will contribute in a meaningful way to the ability of the recipient of the information to understand the information or assess its importance." H. Conf. Rep. 1720, 95th Cong., 2d Sess. 23 (Oct. 5, 1978).

The use of "necessary" in §§ 1801(e) and 1801(h)(2) sheds light on the word's meaning in § 1806(f). As the Supreme Court has observed, "[I]dentical words and phrases within the same statute should normally be given the same meaning." *Hall v. United States*, 132 S. Ct. 1882, 1891 (2012) (quotation omitted).

9

Under this principle, the meanings ascribed to "necessary" in §§ 1801(e), 1801(h)(2), and 1806(f) should be the same, absent an indication to the contrary. And, according to the legislative history, the meanings are very similar: "significant need" in § 1801(e), "contribute in a meaningful way" in § 1801(h)(2), and "substantially promote" in § 1806(f).

### C. The Legislative Purpose of FISA--To Balance Civil Liberties and National Security--Supports the "Substantially Promotes" Standard.

A court must construe a statutory term "in a manner consistent with the [statute's] purpose." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001); *see, e.g., Yates v. United States*, 135 S. Ct. 1074, 1081-82 (2015) (plurality opinion) (looking to "broader context of the statute as a whole" to determine meaning of statutory phrase) (quotation omitted). FISA "was enacted to create a framework whereby the Executive could conduct electronic surveillance for foreign intelligence purposes without violating the rights of citizens."[4] The Act "was intended to strike a sound balance between the need for such surveillance and the protection of civil liberties."[5] Interpreting "necessary" in § 1806(f) to mean

---

[4] *United States v. Hammoud*, 381 F.3d 316, 332 (4th Cir. 2004) (en banc), *vacated on other grounds*, 543 U.S. 1097 (2005), *reinstated in relevant part*, 405 F.3d 1034 (4th Cir. 2005) (en banc).

[5] *In re Kevork*, 788 F.2d 566, 569 (9th Cir. 1986) (quotation omitted); *see, e.g.,* S. Rep. 604(I), *supra*, at 4 (Senate Judiciary Committee Report notes Attorney General Griffin Bell's view that "this bill strikes the balance, sacrifices neither our security nor our civil liberties, and assures that the abuses of the past will remain in

"substantially promote" is fully consistent with FISA's effort to balance civil liberties and the need for surveillance.

Interpreting "necessary" so strictly that disclosure *never* occurs--the district court's approach--does nothing to advance civil liberties. To the contrary, a system that operates in secret, with no adversarial input, as the FISA process has functioned for 37 years, is almost certain to breed abuse. The stark fact is that the FISA system, interpreted by the courts to require ex parte proceedings in *every* case and *never* to grant defense counsel access to FISA applications and orders, has failed to protect civil liberties. Interpreting § 1806(f) as Congress intended, to permit disclosure when adversarial proceedings will substantially promote the accuracy of the district court's determination, marks an important step toward restoring the balance that Congress sought to strike in 1978.

The need to interpret § 1806(f) as Congress intended is particularly stark when--as here--a defendant challenges a FISA order under *Franks v. Delaware*, 438 U.S. 154 (1978). Without access to the underlying applications, orders, and

---

(continued…)

the past . . . ."), *reprinted in* 1978 U.S.C.C.A.N. at 3905-06; *id*. at 7 (bill "goes a long way in striking a fair and just balance between protection of national security and protection of personal liberties"), *reprinted in* 1978 U.S.C.C.A.N. at 3908; *id*. at 9 ("Striking a sound balance between the need for such surveillance and the protection of civil liberties lies at the heart of S. 1566."), *reprinted in* 1978 U.S.C.C.A.N. at 3910; S. Rep. 701, *supra*, at 7, 16 (Senate Intelligence Committee Report with similar remarks), *reprinted in* 1978 U.S.C.C.A.N. at 3975, 3985.

related materials (affidavits accompanying the applications, for example), the defense can only speculate; it cannot identify specific falsehoods or omissions to make the "substantial preliminary showing" that *Franks* requires for an evidentiary hearing. *Id*. at 155-56. As Judge Ilana Rovner recently acknowledged, "Thirty-six years after the enactment of FISA, it is well past time to recognize that it is virtually impossible for a FISA defendant to make the showing that *Franks* requires in order to convene an evidentiary hearing." *United States v. Daoud*, 755 F.3d 479, 496 (7th Cir. 2014) (Rovner, J., concurring), *cert. denied*, 135 S. Ct. 1456 (2015). Judge Rovner added:

> A *Franks* motion is premised on material misrepresentations and omissions in the warrant affidavit; but without access to that affidavit, a defendant cannot identify such misrepresentations or omissions, let alone establish that they were intentionally or recklessly made. As a practical matter, the secrecy shrouding the FISA process renders it impossible for a defendant to meaningfully obtain relief under *Franks* absent a patent inconsistency in the FISA application itself or a *sua sponte* disclosure by the government that the FISA application contained a material misstatement or omission.

*Id*. at 486 (Rovner, J., concurring). The district court, lacking access to the discovery, to the information the defense possesses through its own knowledge and investigation, and to investigative resources, cannot assess on its own whether the applications contain falsehoods, or whether they omit information that would change the probable cause assessment. *See id*. ("[T]he court, which does have access to the application, cannot, for the most part, independently evaluate the

accuracy of that application on its own without the defendant's knowledge of the underlying facts.").

Judge Rovner recognized that "*Franks* serves as an indispensable check on potential abuses of the warrant process, and means must be found to keep *Franks* from becoming a dead letter in the FISA context." *Id*. Those "means" are readily available here: provide defense counsel access to the FISA applications, orders, and other materials, as Congress intended.

The government invariably resists disclosure of FISA materials to defense counsel on the ground that *any* disclosure of FISA materials, *ever*, to *any* defense counsel, under *any* circumstances, will cause irreparable damage to national security. The Senate Judiciary and Intelligence Committees did not accept that view in 1978, as their Reports confirm. As we discuss below, the argument is even more clearly wrong now, following the enactment of the Classified Information Procedures Act ("CIPA") in 1980 (two years after the enactment of FISA) and the extensive experience that courts, prosecutors, and defense counsel have had with the statute since then. Through the use of "appropriate security procedures and protective orders," 50 U.S.C. § 1806(f), including the procedures that CIPA provides, a district court can order disclosure in a manner that adequately protects legitimate national security concerns.

\* \* \* \*

13

The "chameleon-like" word "necessary" in 50 U.S.C. § 1806(f) draws meaning from its context. The context here--particularly the legislative history of FISA and the statutory purpose to balance civil liberties and national security-- shows that disclosure of FISA materials is "necessary" when it will substantially promote the accuracy of the court's determination of the legality of the surveillance.[6]

## II. DISCLOSURE OF THE FISA MATERIALS IS REQUIRED AS A MATTER OF DUE PROCESS.

Production of FISA applications, orders, and related materials is required as well under 50 U.S.C. § 1806(g) and the Fifth Amendment Due Process Clause.[7]

To determine whether due process requires disclosure, the Court must consider the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976): (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used" and "the

---

[6] There is an additional reason to construe "necessary" in this way: that interpretation will avoid the necessity of deciding the due process issues discussed below. Under the doctrine of constitutional avoidance, courts must interpret statutes to avoid creating grave constitutional questions. "It is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quotations omitted); *see, e.g., Cheek v. United States*, 498 U.S. 192, 203 (1991).

[7] Section 1806(g) provides in relevant part that "[i]f the court determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person *except to the extent that due process requires discovery or disclosure*." 50 U.S.C. § 1806(g) (emphasis added).

14

probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Id.* at 335; *see, e.g., American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1068-71 (9th Cir. 1995) (applying *Mathews* test to determine whether use of secret evidence violates due process); *Rafeedie v. INS*, 880 F.2d 506, 524-25 (D.C. Cir. 1989) (*Mathews* balancing test governs process due alien in exclusion proceeding, including use of secret evidence), *on remand*, 795 F. Supp. 13, 18-20 (D.D.C. 1992) (same); *Kiareldeen v. Reno*, 71 F. Supp. 2d 402, 413-14 (D.N.J. 1999) (same). Application of the *Mathews* test confirms that Mohamud must be granted access to the FISA materials as a matter of due process. The *Brady* due process analysis similarly requires disclosure.

### A. The "Private Interest."

Mohamud's "private interests" here are extremely weighty. He seeks an accurate determination of his claim that the government's secret surveillance violated his rights under FISA and the Fourth Amendment. He seeks to vindicate his constitutionally protected right to privacy. More generally, he seeks through the processes of this Court to avoid deprivation of his liberty. If mere property interests "weigh heavily in the *Mathews* balance," as the Supreme Court has held,

*United States v. James Daniel Good Real Property*, 510 U.S. 43, 54-55 (1993), Mohamud's privacy and liberty interests have even greater significance.

### B. The Risk of Erroneous Deprivation and the Value of Additional Procedures.

Turning to the second *Mathews* factor, the adjudication of Mohamud's rights under FISA and the Fourth Amendment through *ex parte* review of materials that his counsel had no opportunity to examine or challenge--carries a notoriously significant "risk of an erroneous deprivation" of the liberty interests at issue, and "additional . . . procedural safeguards"--access to the FISA materials and an opportunity to address them--carry substantial "probable value." *Mathews*, 424 U.S. at 335. The Supreme Court has declared that "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'" *James Daniel Good*, 510 U.S. at 55 (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)). As this Court observed in a secret evidence case, "'One would be hard pressed to design a procedure more likely to result in erroneous deprivations.' . . . [T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *American-Arab Anti-Discrimination Committee*, 70 F.3d at 1069 (quoting district court); *see, e.g., id.* at

1070 (noting "enormous risk of error" in use of secret evidence); *Kiareldeen*, 71 F. Supp. 2d at 412-14 (same).

In the Fourth Amendment context, the Supreme Court has twice rejected the use of *ex parte* proceedings on grounds that apply equally here. In *Alderman v. United States*, 394 U.S. 165 (1969), the Court addressed the procedures to be followed in determining whether government eavesdropping in violation of the Fourth Amendment contributed to its case against the defendants. The Court rejected the government's suggestion that the district court make that determination *ex parte* and *in camera*. The Court observed that

> [a]n apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances.

*Id.* at 182. In ordering disclosure of improperly recorded conversations, the Court declared:

> Adversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny that the Fourth Amendment exclusionary rule demands.

*Id.* at 184.

Similarly, the Court held in *Franks* that a defendant must be permitted to attack the veracity of the affidavit underlying a search warrant, upon a preliminary showing of an intentional or reckless material falsehood. The Court rested its decision in significant part on the *ex parte* nature of the procedure for issuing a search warrant and the value of adversarial proceedings:

> [T]he hearing before the magistrate [when the warrant is issued] not always will suffice to discourage lawless or reckless misconduct. The pre-search proceeding is necessarily ex parte, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence. The usual reliance of our legal system on adversary proceedings itself should be an indication that an ex parte inquiry is likely to be less vigorous. The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations. The pre-search proceeding will frequently be marked by haste, because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an independent examination of the affiant or other witnesses.

438 U.S. at 169.

The same considerations that the Supreme Court found compelling in *Alderman* and *Franks* militate against *ex parte* procedures in the FISA context. As the FISC itself has acknowledged, for example, without adversarial proceedings, systematic executive branch misconduct–-including submission of dozens of FISA applications with "erroneous statements" and "omissions of material facts"--went entirely undetected by the courts until the DOJ chose to reveal it. *See In re All Matters*, 218 F. Supp. 2d 611, 620-21 (FISC) (Lamberth, J.), *rev'd*, 310 F.3d 717

(FISCR 2002).[8]  In 2009, the FISC declared itself "deeply troubled" by incidents in which the NSA violated the court's orders.  It noted that those incidents "occurred only a few weeks following the completion of an 'end to end review' by the government of NSA's procedures and processes for handling the BR metadata, and its submission of a report intended to assure the Court that NSA had addressed and corrected the issues giving rise to the history of serious and widespread compliance problems in this matter and had taken the necessary steps to ensure compliance with the Court's orders going forward."  *In re FBI*, 2009 U.S. Dist. LEXIS 132935, at *4 (FISC Sept. 25, 2009) (Walton, J.).  And again in 2011, the FISC was "troubled that the government's revelations regarding NSA's acquisition of Internet transactions mark the third instance in less than three years in which the government has disclosed a substantial misrepresentation regarding the scope of a major collection program."  *[Redacted]*, 2011 U.S. Dist. LEXIS 157706, at *20 n.14 (FISC Oct. 3, 2011) (Bates, J.).

In light of the almost complete exclusion of criminal defendants and their counsel from the FISA review process, and the correspondingly low risk that misconduct will be detected, it is understandable, if inexcusable, that officials "engaged in the often competitive enterprise of ferreting out crime," *Johnson v.*

---

[8] The FISC was sufficiently alarmed by these erroneous applications that it "decided not to accept inaccurate affidavits from FBI agents whether or not intentionally false," and "[o]ne FBI agent was barred from appearing before the Court as a FISA affiant."  *In re All Matters*, 218 F. Supp. 2d at 621.

*United States*, 333 U.S. 10, 14 (1948), may have come to believe that FISA offers a convenient means of circumventing the traditional Title III and search warrant processes.

Three stark statistics underscore the dysfunction of the current FISA system: (1) year in and year out, the FISC approves without modification the overwhelming majority of the FISA applications the government presents and rejects only a tiny handful--if that--out of more than a thousand;[9] (2) no court has ever granted defense counsel access to FISA applications and orders under § 1806(f), so no adversarial eye has ever scrutinized them; and (3) no court has ever granted a motion to suppress the fruits of FISA surveillance.

As these statistics suggest, *ex parte* review does not adequately protect the surveillance target's constitutional and statutory rights. The "additional . . . procedural safeguards" that Mohamud requests--access to the FISA materials and an opportunity to address them-–thus carry substantial "probable value." *Mathews*, 424 U.S. at 335.

---

[9] According to the Attorney General's annual reports (available at http://fas.org/irp/agency/doj/fisa), since 1978 the FISC has approved (either as submitted or with modifications) well over 20,000 applications or extensions authorizing FISA surveillance, more than 99% of the total applications submitted. The FISC has rejected outright only a handful of applications, and the DOJ has successfully resubmitted some of those. The statistics for 2014 are typical: the government made 1,379 applications for electronic surveillance; none were denied or withdrawn; and the FISC modified 19 applications.

### C.    The Government's Interest.

Finally, the Court must consider the government's purported interest in maintaining the secrecy of the FISA materials.  The government typically asserts its generalized interest in avoiding damage to "national security," without any effort to demonstrate that disclosure of the FISA materials to defense counsel under the circumstances of this case would cause such damage.  Courts have previously rejected such diffuse claims of national security.  *See, e.g., Arab-American Anti-Discrimination Committee*, 70 F.3d at 1070 ("We cannot in good conscience find that the President's broad generalization regarding a distant foreign policy concern and a related national security threat suffices to support a process that is inherently unfair because of the enormous risk of error and the substantial personal interests involved."); *Kiareldeen*, 71 F. Supp. 2d at 414 (same); *Rafeedie*, 795 F. Supp. at 19 (same).

The government's asserted national security interest in withholding the FISA materials from the defense is particularly weak in light of the protections available under CIPA.  Most critically, CIPA provides for entry of a protective order.[10]  The CIPA protective order--the standard terms of which are largely settled after decades of experience--sets the conditions under which defense counsel may review classified discovery, establishes procedures for filing classified pleadings,

---

[10] 18 U.S.C. App. 3 § 3.

and prohibits anyone associated with the defense from revealing publicly the classified information to which access is granted. *See, e.g., United States v. Gowadia*, 2010 U.S. Dist. LEXIS 80572 (D. Haw. May 8, 2010) (entering a typical CIPA protective order).

The protective order also appoints Court Security Officers in accordance with the security procedures adopted by the Chief Justice under CIPA § 9(a).[11] Although the CSOs work for the Department of Justice, they are independent of the prosecution team. They advise the parties and the district court on the proper handling of classified information, and they serve as conduits for the flow of classified discovery and pleadings among the parties and the court.[12]

The CIPA protective order requires defense counsel and other members of the defense team to obtain security clearances before receiving access to classified discovery. The protective order also requires the defense to maintain all classified information in a Sensitive Compartmented Information Facility, or SCIF. The SCIF consists of one or more secure rooms, usually in the federal courthouse where the case is being heard. It is protected by locks and other security devices. The SCIF contains safes to hold classified documents, secure computers on which to prepare classified pleadings, and other approved equipment.

---

[11] 18 U.S.C. App. 3 § 9(a). The procedures, issued by Chief Justice Warren Burger in 1981, appear in a note following CIPA § 9.

[12] *See* 9 United States Attorney's Manual, Criminal Resource Manual § 2054(I)(C) (describing role of CSO).

Once the protective order is in place, defense counsel has the necessary clearance, and the SCIF is ready, the parties begin the classified discovery process. CIPA § 4 governs classified discovery. That provision allows the court to authorize the government, "upon a sufficient showing," to delete classified information from the discovery it provides or to furnish substitutions for the classified information in the form of summaries or admissions. The statute adds that "[t]he court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone." 18 U.S.C. App. 3 § 4.

CIPA has been in existence for 35 years. During that time huge volumes of enormously sensitive classified information have been made available under its strict security measures to cleared defense counsel in scores of federal criminal cases--without, as far as counsel are aware, a serious security violation by the defense. In one case, for example, the CIPA procedures successfully protected nuclear weapon codes that government scientists testified under oath were capable of "changing the strategic global balance" and thus "represent[ed] the gravest possible security risk to the United States." *United States v. Lee*, 2000 U.S. App. LEXIS 3082, at *5-*6 (10th Cir. Feb. 29, 2000). If the CIPA procedures could adequately protect those secrets (and other sensitive classified information in many other cases), they can surely protect the secrets contained in the FISA materials at

issue here. In short, CIPA provides precisely the "appropriate security procedures and protective orders" that Congress contemplated would accompany disclosure when it enacted FISA. 50 U.S.C. § 1806(f).

### D. Disclosure Is Also Required Under *Brady*.

*Brady* requires production of material evidence that would be favorable to the defendant on a motion to suppress. *See United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, *whether at trial or on a motion to suppress*, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.") (emphasis added). For the reasons we have outlined, the FISA applications and other materials are helpful to the defense in preparing the motion to suppress the FISA-derived evidence. *Brady* thus requires their disclosure.

### CONCLUSION

Six decades ago, the Supreme Court declared that "since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense." *Jencks v. United States*, 353 U.S. 657, 671 (1957) (quotation omitted); *see, e.g., United States v. Reynolds*, 345 U.S. 1, 12 (1953);

*United States v. Andolschek*, 142 F.2d 503, 506 (2d Cir. 1944). As Congress recognized, the *Jencks* principle informs FISA litigation, just as it does other aspects of the criminal process. The Court should interpret § 1806(f) in accordance with its language, history, and purpose and grant Mohamud's counsel access to the underlying FISA materials.

DATED: June 3, 2015                          Respectfully submitted,


      */s/  John D. Cline*
John D. Cline
Attorney for Amicus Curiae
NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief is proportionately spaced, has a typeface of

14 points, and contains 6003 words.


_____/s/   John D. Cline_____
John D. Cline
Attorney for Amicus Curiae
NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE
LAWYERS

## CERTIFICATE OF SERVICE

I hereby certify that on this 3d day of June, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/  John D. Cline*
John D. Cline

27

## CERTIFICATION

U.S. Court of Appeals Docket Number: 14-30217

I hereby certify that the bound copy of the Brief of Amicus Curiae National Association of Criminal Defense Lawyers in Support of Appellant and Urging Reversal is identical to the version submitted electronically.


    /s/   *John D. Cline*

John D. Cline